## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| TOM TARANTINO and ROCHELLE ROSEN, individually and on behalf of all others similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>JOHNSON AND JOHNSON PENSION AND BENEFITS COMMITTEE, PETER FASOLO, and JOHN DOES 1-10,<br><br>      Defendants. | Case No.  3:19-cv-1115<br><br>**CLASS ACTION COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

### CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE
### EMPLOYEE RETIREMENT INCOME SECURITY ACT

Plaintiffs Tom Tarantino and Rochelle Rosen ("Plaintiffs"), by and through their attorneys, file this Complaint on behalf of themselves and other similarly situated current and former employees of Johnson and Johnson ("J&J" or the "Company") who were participants in and beneficiaries of the Johnson and Johnson Savings Plan (the "Plan") and who were invested in the Johnson and Johnson Common Stock Fund (the "Fund") during the period of February 22, 2013 through January 25, 2019, inclusive (the "Class Period").  Plaintiffs allege the following based on personal knowledge with respect to their own circumstances and based on information and belief pursuant to the investigation of their counsel, which included a review of the Plan's governing documents; the Plan's annual reports filed with the United States Securities and Exchange Commission ("SEC") and U.S. Department of Labor ("DOL"); discussions with Plan participants; other SEC filings by J&J; other lawsuits against J&J; press releases and other public statements issued by J&J; and media reports and analyses regarding J&J.  Plaintiffs believe that substantial

additional evidentiary support exists and will emerge for the allegations set forth herein after there has been a reasonable opportunity for discovery.

## I.  INTRODUCTION

1.      This is a class action brought pursuant to Section 502 of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132, against Johnson and Johnson's Pension and Benefits Committee (the "Committee"), known member of the Committee Peter Fasolo ("Fasolo"), and unknown members of the Committee John Does 1-10 (collectively "Defendants") by participants in the Plan, and on behalf of the Plan, to recover many millions of dollars of damages suffered in their retirement accounts due to breaches of fiduciary duties owed to them.  Fiduciaries of the Plan, who owed "the highest duty known to the law" to Plan participants, breached those duties throughout the Class Period when they knew that J&J's stock price had become artificially inflated in value, which made the Fund, which primarily invested in J&J stock, an imprudent investment under ERISA, thereby damaging the Plan and those Plan participants invested in the Fund.

2.      As fiduciaries, Defendants had responsibility for the Plan's management, operations and investments.  They breached their fiduciary duties to the Plan and its participants when, as, upon information and belief, high-level corporate insiders, they knew (or should have known) as that J&J's stock price had become artificially inflated due to undisclosed misrepresentation and fraud, yet they took no action whatsoever to protect the Plan or Plan participants from foreseeable resulting harm.  They knowingly permitted Plan participants to purchase and hold an imprudent investment that was disqualified under ERISA as well as damaging to the Plan.

3.     Defendants were duty-bound to try to prevent, or at least to mitigate, any damage caused by the fraud to the Plan and its participants.  They could have mitigated the harm to Plan participants by trying to effectuate, through personnel with disclosure responsibilities, corrective public disclosures to cure the fraud consistent with the requirements of the federal securities laws, thereby making J&J stock an accurately priced, prudent investment again.

4.     Defendants could not reasonably have believed that taking this action would do more harm than good to the Plan or to Plan participants.  J&J stock traded in an efficient market. As, upon information and belief, experienced senior executives, Defendants were—or should have been—familiar with the rudimentary principles of how securities trade in efficient markets.  Thus, they would have known that correcting the Company's fraud would reduce J&J's stock price only by the amount by which it was artificially inflated to begin with.  They had no basis to believe that any factor was distorting the market for J&J stock at the time—such as widespread short-selling or liquidity problems or the like—and thus no reason to fear that public correction of the Company's fraud would reduce J&J's stock price to anything but its true, accurate value.

5.     Moreover, Defendants should have known that, the longer the artificial inflation of the Company's stock persisted, the greater the risk of reputational harm that would inure to J&J upon revelation of the truth.  When a public company like J&J prolongs a fraud, the likelihood of a harsher price correction and a more lethargic price recovery increases.  A prudent fiduciary would take this increasing risk of harm to Plan participants into account in deciding whether and when to act on the basis of inside information.

6.     During the Class Period, and for decades prior, J&J has known its talc products, including Johnson's Baby Powder, contained asbestos fibers.  Asbestos is classified by the U.S. Environmental Protection Agency ("EPA") as a human carcinogen and can cause ovarian cancer

and mesothelioma.  J&J misrepresented and failed to disclose the overwhelming danger that its talc products posed to consumers, J&J's significant liability related to its talc products, and that its revenues from sales of its talc products were unsustainable due to their harmful and dangerous nature.

7.      These false and misleading statements, and J&J's failure to disclose critical, material information to the public, caused the market to improperly value J&J's stock price.  As a result, Defendants, who knew that false and misleading statements were continuously made, also knew that the Company's misrepresentations had artificially inflated the price of J&J stock throughout the Class Period.  When media reports published during the September to December 2017 period finally revealed, according to documents J&J produced pursuant to a court order, that J&J had known for decades that its talc products contained asbestos fibers, its stock price plummeted to its true value, having dropped almost 17% from its Class Period high.

8.      The Plan is sponsored by J&J for eligible employees and is a defined contribution plan.  This class action is brought on behalf of participants in the Plan who, during the Class Period, invested in or held shares of the Fund through the Plan.  Defendants in this case were all fiduciaries of the Plan, and per the requirements of the ERISA statute to which they were subject, they were responsible for monitoring and ensuring the prudence of the Plan's investments.  Among the most important duties of the Plan fiduciaries was ensuring that each Plan investment option remained prudent—including the Fund.  Notwithstanding any language in the Plan that attempted to take decision-making responsibility out of the hands of the Plan's fiduciaries, each Plan fiduciary was obliged under the law to ensure that investment of employee retirement funds in the Fund remained a prudent option based on what each fiduciary knew at the time.  This responsibility to ensure the prudence of the Fund cannot be delegated or abnegated or otherwise avoided.

9.     Founded in 1886, J&J has become the world's largest healthcare company.  In its own words, J&J believes "good health is the foundation of vibrant lives, thriving communities and forward progress.  That's why for more than 130 years, we have aimed to keep people well at every age and every stage of life."  However, upon information and belief, in 1957 J&J first became aware of the presence of asbestos in the talc used to manufacture one of its flagship products, Johnson's Baby Powder.  Since then, through the date of filing this action, J&J has continually insisted that its talc products are safe and pure.  Internal J&J memos throughout the 1960s and 1970s demonstrate not only the Company's knowledge of asbestos in their talc products from internal and external lab results, but also the Company's growing fear over the effects this might have on their profitable powder empire.  Knowing that asbestos was present in its talc products, J&J spent the following decades seeking to influence government agencies responsible for setting acceptable limits of asbestos in consumer products by presenting only favorable lab results, concealing unfavorable results, all while consistently assuring and reassuring consumers of the safety of its talc products.  Unbeknownst to investors, Company stock rose in artificially inflated value throughout the years as J&J polluted consumers' minds, and bodies, with misrepresentations.

10.    J&J has been misrepresenting the link between its talc products and asbestos for over 60 years, thereby spuriously enhancing the Company's financial health.  The truth finally emerged on December 14, 2018 when both Reuters and The New York Times published the shocking results of their investigations into internal J&J documents that only recently became public.  Those documents revealed that J&J knew that its talc products contained carcinogenic asbestos and that the Company had concealed this fact from both government regulators and consumers.  J&J had been concerned for decades about losing its profitable powder empire and

put financial gain ahead of the health and well-being of the users of its products, including newborn babies.

11.     J&J's stock traded at artificially high prices throughout the Class Period, rising as high as $147.84 a share.  But when the truth was finally disclosed to the public by the media, J&J's share price fell dramatically on massive trading volume, dropping nearly 17%, or $25.00 per share, closing at a low on December 24, 2018 of $122.84.  These price declines caused significant losses and damages to Plan participants who were invested in the Fund.

12.     The Plan fiduciaries knew or should have known that the Fund had become imprudent during the Class Period due to undisclosed material facts that had artificially inflated J&J's stock price.  All of the Defendants were fiduciaries of the Plan and owed a fiduciary duty of prudence to Plan participants, and all of them were well-positioned not only to know that harm was being done to those participants, but to take action to prevent that harm.  Specifically, Defendants were all high-level corporate insiders with firsthand knowledge of J&J's misleading disclosures to the market—and thus firsthand knowledge of the fact that J&J's stock price was artificially inflated.

13.     Based on their knowledge, Defendants were duty-bound by ERISA to prevent harm to the Plan and its participants from undisclosed or false material information which they knew made the Fund an imprudent investment for retirement purposes.  They knew that the Plan was harmed with every purchase of Fund shares made at inflated prices, and that the Plan's large holdings of J&J stock were at risk for a sizeable downward price correction—and slower-than-necessary price recovery—after the truth emerged.

14.     Defendants, as high-level corporate insiders, should have tried to effectuate, through personnel with disclosure responsibilities, truthful or corrective disclosures to cure the

fraud and make the Fund a prudent investment again as they were required to do to fulfill their fiduciary duty.

15.     Plan participants who purchased shares of the Fund paid artificially high prices during the Class Period.  They suffered concrete financial harm to their retirement savings by over-paying for J&J stock which, Defendants knew, or should have known, would fall sharply in value when the truth came out and the stock corrected.  When the fraud was revealed, J&J's stock fell by nearly 17%, or $25.00 per share.  The Plan participants who purchased J&J stock were damaged by overpaying this amount, and they bore this foreseeable loss which could have been avoided.  No matter what happens to the stock price in the future, these Plan participants sustained a loss due to paying the excessive artificial price, and they will bear this loss even if J&J stock recovers in the future.

16.     Plan participants who simply held Fund shares suffered greater harm and damage in this same manner from Defendants' failure to act to end the fraud.  While they held J&J shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.  They suffered greater losses when J&J's stock price corrected, and fell further due to the loss of management credibility.  They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from greater losses when the stock correction took place.  Most important, holders suffered a harsher correction than they would have had Defendants acted in a timelier fashion.

17.     Defendants could not have reasonably believed that trying to effectuate corrective disclosure through personnel with disclosure responsibilities would do more harm than good to the Plan or its participants.  Moreover, the participation of the fiduciaries in an effort to conceal

material information about the Company from Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed.

18.     Truthful disclosure was also needed to prevent worse future harm to the Plan and J&J's stock price.  Indeed, the reputational harm to J&J is still being felt by shareholders over a month later; the Company's stock price has yet to recover from its significant decline following the disclosure of J&J's long-term knowledge of the presence of asbestos in its talc products.

19.     Consider that, on the date of the disclosure discussed *infra*, J&J's stock price declined $25.00 per share, or over 17%, to close at $122.84 per share on December 24, 2018.  Just over a month later, on January 25, 2019, J&J stock opened trading at $128.13 per share; in other words, the stock price is still far from having fully recovered from the late disclosure.  A prudent fiduciary, considering when to make a disclosure, would have taken into account the increased risk that a prolonging of the stock's artificial inflation would likely eventuate in this sluggish stock price recovery.

20.     Additionally, causing the issuance of corrective disclosure was arguably required by the federal securities laws.  By the very same mechanism that J&J could have used to make corrective disclosures to the general public under the federal securities laws, it could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public.  Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have caused one corrective disclosure to be made to the world and thereby simultaneously satisfied their obligations under the federal securities laws and ERISA.

21.     J&J's decades-long concealment of the toxicity of one of its most popular products, as well as the lawsuits and other inquiries that probed the Company's program of public-health-

endangering misrepresentation, made the eventual revelation of the asbestos in J&J's talc products virtually inevitable.   A fraud this massive, with consequences this far-reaching, could not reasonably be concealed indefinitely, particularly once litigants began seeking discovery about these products.   Thus, the operative question for Defendants was not whether to disclose or not to disclose this information; rather, it was whether to disclose it sooner or later.   By the time the Class Period began, it was simply not reasonable for Defendants to claim that concealment of asbestos in the Company's talc products still needed to be investigated or confirmed.   The only real question at that point was figuring out the best time to correct the stock's artificial inflation and end the imprudence of Plan participants' retirement savings investment.   Given the inevitability of disclosure as well as the increasing risk of a harsher correction and a slower recovery, the only prudent option was to try to effectuate corrective disclosure as early in the Class Period as possible through the regular reporting mechanisms of the securities laws.

22.   But Defendants did not act.   Instead, they breached their fiduciary duties to the Plan and Plan participants.   Defendants knew that asbestos was present in J&J's talc products, that the Company's financial results and assurances of the products' safety were false and misleading, and that J&J's stock price was artificially inflated and imprudent.   Yet, Defendants failed to cause corrective disclosures to be made, so Plan participants were harmed by overpaying for imprudent stock at artificially inflated prices, and they were denied the opportunity to make informed alternative investments.

23.   Instead, Defendants allowed their employee Plan participants to whom they owed their fiduciary duties to purchase and hold an imprudent investment throughout the Class Period without taking action to protect them in any way.   During that time, J&J's stock price went from approximately $148 per share to less than $123 per share, costing Plan participants many millions

of dollars in retirement savings.  Meanwhile, other investments in the Plan have fared far better, and J&J faces lawsuits, significant losses, and a struggle to repair the serious damage to its reputation and credibility.  Defendants are directly responsible as fiduciaries for the enormous harm that their breaches of their duties caused.

## II.  JURISDICTION AND VENUE

24.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331 and ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1).

25.  Venue is proper in this district pursuant to ERISA § 501 (e)(2), 29 U.S.C. § 1132(e)(2), because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and J&J is incorporated in New Jersey and resides and maintains its primary place of business in this district.

26.  Specifically, this district is an appropriate venue for this action because the Plan's Forms 5500 filed with the Internal Revenue Service identify the address of the Plan as being in this district.  Additionally, it is likely that many of the parties and potential witnesses are located in, or are within close proximity to, this district.

## III.  PARTIES

27.  Plaintiff Tom Tarantino is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Until 2007, he was an employee of J&J, and he was and continues to be a participant in the Plan.  He purchased and held shares of the Fund in his Plan retirement savings account during the Class Period.

28.  Plaintiff Rochelle Rosen is a Plan participant within the meaning of ERISA § 3(7), 29 U.S.C. § 1102(7).  Until 1994, she was an employee of J&J, and she was and continues to be a

participant in the Plan.  She purchased and held shares of the Fund in her Plan retirement savings account during the Class Period.

29.     Defendant Johnson and Johnson Pension and Benefits Committee is a committee established by the governing documents of the Plan and is a "named fiduciary" of the Plan according to those documents.  The Committee was a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.

30.     Defendant Peter Fasolo was Executive Vice President, Chief Human Resources Officer, and Chairman of the Johnson and Johnson Pension and Benefits Committee as well as the Plan Administrator, and was therefore a Plan fiduciary pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets, throughout the Class Period.  Fasolo was also a member of Johnson and Johnson's Executive Committee.

31.     Defendants John Does 1-10, without limitation, are the unknown members of the Johnson and Johnson Pension and Benefits Committee, any other committee(s) which administered the Plan, and all members thereof.  The identity of the committee(s) and the members of the committee(s) which were responsible for carrying out the provisions of the Plan is currently not known.  John Does 1-10 are Plan fiduciaries pursuant to ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), by virtue of having discretionary authority and control regarding the management of the Plan and/or the Plan's assets throughout the Class Period, and are believed to be employees of the Company.

## IV.   THE PLAN

32.     The Plan is a participant-directed defined contribution benefit plan which was established on June 1, 1982 for eligible salaried and non-union hourly employees of the Company. The Plan is sponsored by J&J and is subject to ERISA.  The funding of the Plan is made through employee and Company contributions.

33.     Full-time salaried employees and certain non-union hourly, part-time and temporary employees can contribute to the Plan.  There is no service requirement for employee contributions.  Employees can defer a minimum of three percent up to a maximum of 50% of their compensation into the Plan.  Plan participants receive a Company matching contribution equal to 75% of the first six percent of their contributions.  The Company matching contribution is invested in the current investment fund mix chosen by the Participant.

34.     The Plan's governing documents include the Johnson & Johnson Savings Plan (As Amended and restated effective as of January 1, 2008), which sets forth, among other things, the identities of the "named fiduciaries" of the Plan and their powers and responsibilities with respect to the Plan.

35.     The Plan was established "for the purpose of providing retirement benefits to Johnson & Johnson's eligible employees."  (Preamble.)  The Committee is a "named fiduciary" of the Plan.  (Plan § 12.02(a).)  The Committee "shall control and manage the operation and administration of the Plan…."  (Plan § 12.01.)

36.     Among the Committee's powers is the authority to appoint, retain or remove third-party "investment managers[]" responsible for the day-to-day oversight of the Plan's investment options, including the Fund, to "act as administrator of the Plan," and to "[m]anage the investment of the assets of the Plan."  (Plan § 12.03(c)(ii-iii).)  The Committee is permitted by the Plan to

delegate to third parties "fiduciary responsibilities … in accordance [with] ERISA Section 405(c)," although even if they do so they continue to retain significant fiduciary powers.  (Plan §§ 12.02(b), 12.03.)

37.     Despite its seemingly ample ability to delegate its powers under the Plan, the Committee was still a fiduciary subject to ERISA, which forbids fiduciaries from offloading their duties onto others entirely, however much they might want to do so.  Thus, when the Committee— particularly Committee member Fasolo—became aware of the artificial inflation of J&J's stock price, and the concomitant harm to Plan participants that this inflation would cause, they were still obligated under ERISA to use what powers they had under the Plan to protect those participants from harm.

38.     As senior corporate officers, Fasolo and other members of the Committee should have tried to effectuate, through personnel with disclosure responsibilities, truthful or corrective disclosures to the public regarding the presence of asbestos in J&J's talc products, thereby ameliorating the problem of artificial inflation, complying with their fiduciary obligation to tell the truth to Plan participants, and curing the fraud to make the Fund a prudent investment again.

39.     Thus, when Fasolo and other members of the Committee became aware of the artificial inflation of J&J's stock price and the harm that it was causing Plan participants, they should have taken action to protect Plan participants from further harm.  Given his senior role and membership on J&J's Executive Committee, Fasolo was well positioned to petition fellow Executive Committee members Alex Gorsky ("Gorsky") and Dominic Caruso ("Caruso"), J&J's Chief Executive Officer ("CEO") and Chief Financial Officer ("CFO"), respectively, who had considerable responsibility for the financial picture disclosed in J&J's public filings, to make truthful or corrective disclosures to the public regarding the presence of asbestos in J&J's talc

products.  Thus, Fasoll could have made an effort to ensure that the public disclosures of J&J were truthful, thus ensuring truthful communication with Plan participants and precluding further distortion of J&J's stock price.  And, like other members of the Committee, Fasolo could have disclosed his knowledge to his co-fiduciaries, including any others to whom he had delegated his fiduciary responsibilities, to enable them to take action (as set forth above) to protect Plan participants as well.

## V.      THE FIDUCIARY BREACHES

### A.      Background

40.      J&J was founded in 1887 and is engaged in the research and development, manufacture and sale of a broad range of products in the health care field.  The Company currently has approximately 134,000 employees worldwide spread across more than 260 operating companies.  J&J is located in more than 60 countries, including the U.S., and sells products in virtually all countries throughout the world.

41.      J&J is organized into three business segments:  Consumer, Pharmaceuticals, and Medical Devices.  The Consumer segment focuses on products used in the baby care, oral care, beauty, over-the-counter pharmaceutical, women's health and wound care markets; Johnson's Baby Powder is included in this line of products.

42.      The Executive Committee of J&J is the principal management group responsible for the strategic operations of the Company.  This committee oversees and coordinates the activities of the Company's three business segments.  Senior management groups at U.S. and international operating companies are each responsible for their own strategic plans and the day-to-day operations of those companies.  Members of the Executive Committee include its Chairman, Gorsky, who is also J&J's CEO and Chairman of the Board, Vice Chairman Joaquin Duato ("Duato"), who is a 28-year veteran of J&J and is responsible for the Company's Consumer and

Pharmaceutical sectors, J&J's CFO Caruso (through July 2018), Jorge Mesquita ("Mesquita"), who is an Executive Vice President and Worldwide Chairman of the Consumer sector, Vice Chairman Paul Stoffels, M.D. ("Stoffels"), who has been with J&J since 2002 and is the Chief Scientific Officer, Michael Sneed ("Sneed"), who is a 36-year veteran of J&J and is the Executive Vice President of Global Corporate Affairs and Chief Communications Officer, J&J's General Counsel Michael H. Ullmann ("Ullmann"), and new CFO, since July 2018, Joseph Wolk ("Wolk").

43.     J&J's most widely known and flagship consumer product is Johnson's Baby Powder.  It first hit markets well over a century ago in 1894.  Johnson's Baby Powder has long been marketed as a product useful to consumers of all ages and has been used generation after generation.  This seemingly innocent product, though, has been hiding a dark and deadly secret, perhaps even since it hit stores in 1894—asbestos, a known carcinogen.

44.     The primary ingredient in Johnson's Baby Powder is talc, an inorganic material that is extracted from the earth through mining and later refined for use in consumer products.  Asbestos naturally occurs underground near talc deposits.  When viewed on a microscopic level, asbestos looks like tiny dagger-like fibers which penetrate deep into human tissue and lead to lung cancer, cancer of the voice box, ovarian cancer, and mesothelioma.  The link between asbestos and ovarian cancer has been reported since at least 1958; in 2011, the International Agency for Research on Cancer named asbestos a "cause" of ovarian cancer.

45.     Thousands of lawsuits against J&J have alleged that its talc products caused cancer, yet J&J has always maintained the same position—"our products do not contain asbestos." However, in a recent asbestos-related ovarian cancer litigation, J&J was ordered by a court to produce "troves of internal Johnson & Johnson documents" which tell an entirely different story—

J&J has known for decades that its talc products contained asbestos and the Company has gone to great lengths to conceal this information from government regulators and consumers.

46.     According to an article published by *Reuters* on December 14, 2018, "Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder," internal J&J documents examined by *Reuters* show that the Company was aware of "tainted J&J talc" as early as 1957. Lab reports mentioned "fibrous and 'acicular,' or needle-like, tremolite."  Tremolite is a mineral that in its naturally occurring fibrous form is classified as asbestos.  Lab reports since then, all the way into the early 2000s, showed similar findings.

47.     A November 1967 memo written by William Ashton ("Ashton"), then J&J executive who had been in charge of J&J's talc supply for decades, again showed the presence of tremolite.  Traces of the mineral appeared when samples from a new talc mine located in Vermont were tested.  Just two years later, in 1969, Ashton penned a memo to a company doctor suggesting that J&J rethink its approach.  He wrote, "Historically, in our Company, Tremolite has been bad … How bad is Tremolite medically, and how much of it can safely be in a talc base we might develop?"  In response, J&J's founder's son, Robert Wood Johnson II, then-retired CEO, expressed "concern over the possibility of the adverse effects on the lungs of babies or mothers."

48.     By the 1970s, asbestos was already widely known as the primary cause of mesothelioma, this caused President Nixon to pass regulations setting limits on exposure to asbestos dust in the workplace.  In 1971, after receiving reports that "two unidentified brands of cosmetic talc appeared to contain asbestos," the U.S. Food and Drug Administration ("FDA") opened an inquiry.  J&J quickly issued a clear public statement, "Our fifty years of research knowledge in this area indicates that there is no asbestos contained in the powder manufactured by Johnson & Johnson."  However, soon after the public statement, Mount Sinai researcher Arthur

Langer informed J&J by letter that his team had found "relatively small" amounts of asbestos in Johnson's Baby Powder.

49.     Throughout the remainder of the 1970s, J&J fought back against the "attack on talc," often by deceiving government regulators.  In July of 1971, a delegation of scientists were sent to Washington to meet with the FDA team investigating the presence of asbestos in talc products.  Both the FDA's accounts and internal J&J records memorializing the meeting showed that J&J talc contained asbestos, the FDA described it at levels "less than 1%" while J&J called it "trace amounts."  As the FDA continued its investigation, J&J began sending samples of its talc to private and university labs.  Although results showed that some samples tested positive for asbestos, those findings did not make it into J&J's final report to the FDA; instead, J&J reported that "the 'results clearly show' the samples tested 'contain no chrysotile asbestos.'"

50.     In 1973, J&J explored acquiring patents on a process being developed by a British mineralogist to separate talc from tremolite.  Tom Shelley, then director of J&J's Central Research Laboratories in New Jersey recognized that tremolite may one day be prohibited in talc products and therefore a patent on the process of removing it would be valuable to the Company.  Shelley later penned a memo to one of J&J's lawyers, "We will want to carefully consider the … patents re asbestos in talc.  It's quite possible that we may wish to keep the whole thing confidential rather than allow it to be published in patent form and thus let the whole world know."  The patent was never acquired.

51.     Around the same time in 1973, the FDA had finally proposed a rule limiting the amount of asbestos contained in talc to 0.1%.  Internal J&J documents show that the Company recognized that it "may have problems" depending on the particular test the FDA would adopt for detecting asbestos in talc.  J&J proposed a x-ray scanning technique that would allow for an

"automatic 1% tolerance for asbestos," a level ten times that proposed by the FDA.  However, J&J failed in its efforts and shifted its focus to persuading the FDA that self-policing in the industry was a better solution than government regulation.  In support, J&J again provided lab results showing that after testing samples over a 10-month period its talc contained no asbestos.  Yet, just as it had previously done, J&J's report omitted contradictory findings from independent laboratories.  Sadly, the FDA abandoned its efforts to regulate asbestos levels in talc.

52.     Astonishingly, at first blush, in 1976, the Cosmetic, Toiletry, and Fragrance Association ("CFTA"), now known as the Personal Care Products Council, drafted voluntary guidelines which limited asbestos levels in talc to 0.5%.  However, looking deeper, it is important to note two things:  (i) the CFTA committee responsible for the guidelines was chaired by a then J&J executive, and (ii) the testing procedure, x-ray scanning (the same method proposed by J&J to the FDA a couple of years earlier, which is also the same method J&J has reportedly used for decades), was not in fact designed to detect the most common type of asbestos.  J&J appeared to have won the "attack on talc" battle.  For the next 16 years, J&J continued to produce and sell talc products, endangering consumers and raking in profits, as the world seemed to adopt J&J's continued assertions that its talc products were safe.

53.     In 1989, J&J sold its Vermont talc mines to Cyprus Minerals ("Cyprus").  Three years later, in 1992, Cyprus flagged "important environmental issues" in internal memos.  It had found tremolite in its talc reserves, reserves from the Hammondsville mine, which was J&J's primary source of talc used to manufacture Johnson's Baby Powder since 1966.  Then again, in 2002 and 2003, the operators of the same Vermont talc mine discovered the presence of asbestos fibers in talc that was used to produce Johnson's Baby Powder sold in Canada.

54.     J&J's talc safety research is best summed up by its own March 1975 internal memo,

> Our current posture with respect to the sponsorship of talc safety studies has been to initiate studies on as dictated by confrontation. This philosophy, so far, has allowed us to neutralize or hold in check data already generated by investigators who question the safety of talc … we minimize the risk of possible self-generation of scientific data which may be politically or scientifically embarrassing.

55.     Various governmental and non-governmental organizations have recognized the link between talc and cancer.  Upon information and belief, in or about 1990, the FDA asked manufacturers of surgical gloves to stop using talc in their products.  In or about 1996, the FDA asked the condom industry to stop dusting condoms with talc.  In 2005, the Fifth Edition of "Myths & Facts About Ovarian Cancer.  What You Need to Know," was published and listed "Use of Talc (Baby Powder) in the Genital Area" as a risk factor.  In 2006, the Canadian government classified talc as a "very toxic, cancer causing substance."   In 2008, the Cancer Prevention Coalition petitioned the FDA to require a prominent warning on talc products that frequent perineal talc application increases the risk of ovarian cancer.  In 2010, the International Association for the Research of Cancer classified talc-based body powder as a human carcinogen.  Both the National Cancer Institute and American Cancer Society warn that genital talc use is a risk factor for ovarian cancer.

**B.    J&J's False Disclosures and Financial Reports**

56.      On February 22, 2013, the Company filed a Form 10-K for the fiscal year ended December 30, 2012 (the "2012 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures were effective as of December 30, 2012.  The 2012 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the

Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2012 10-K stated that the Company's internal control over financial reporting was effective as of December 30, 2012. The 2012 10-K was signed by Executive Committee members Gorsky and Caruso. The 2012 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

57.    The 2012 10-K discussed J&J's baby products, stating in pertinent part:

> The Consumer segment includes a broad range of products used in the baby care, skin care, oral care, wound care and women's health care fields, as well as nutritional and over-the-counter pharmaceutical products, and wellness and prevention platforms. The Baby Care franchise includes the JOHNSON'S® Baby line of products.

58.    The 2012 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

> **Research and Development**
>
> Research activities represent a significant part of the Company's businesses. Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch. The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products**…
>
> **Environment**
>
> The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.
>
> \*     \*     \*

20

**Management's Objectives**

The Company manages within a strategic framework aimed at achieving sustainable growth.  To accomplish this, the Company's management operates the business consistent with certain strategic principles that have proven successful over time.  To this end, the Company participates in growth areas in human health care and is committed to attaining leadership positions in these growth areas through the development of high quality, innovative products and services.

(Emphasis added).

59.     The 2012 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.  In the United States, the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

60.     Exhibit 13 to the 2012 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

61.     Exhibit 13 to the 2012 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue," stating in pertinent part:

Certain subsidiaries of Johnson & Johnson are involved in numerous product liability cases.  The damages claimed are substantial, and while **these subsidiaries are confident of the adequacy of the warnings and instructions for use that accompany the products at issue**, it is not feasible to predict the ultimate outcome of litigation.  The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the

21

accruals may be required in the future as additional information becomes available.

(Emphasis added.)

62. On February 21, 2014, the Company filed a Form 10-K for the fiscal year ended December 29, 2013 (the "2013 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 29, 2013. The 2013 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2013 10-K stated that the Company's internal control over financial reporting was effective as of December 29, 2013. The 2013 10-K was signed by Executive Committee members Gorsky and Caruso. The 2013 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

63. The 2013 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, skin care, oral care, wound care and women's health fields, as well as nutritionals, over-the-counter pharmaceutical products and wellness and prevention platforms. The Baby Care franchise includes the JOHNSON'S® Baby line of products.

64. The 2013 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses.  Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch.  The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures.  The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

\*         \*         \*

The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing broadly accessible, high quality, innovative products and services.

(Emphasis added).

65.     The 2013 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.  In the United States, the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

66.     Exhibit 13 to the 2013 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

67.     Exhibit 13 to the 2013 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

> Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages. While these subsidiaries believe they have substantial defenses, it is not feasible to predict the ultimate outcome of litigation. The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited. Changes to the accruals may be required in the future as additional information becomes available.

> (Emphasis added).

68.     On May 12, 2014, J&J issued the following statement in an article published by *Fox 32*, titled "Popular Baby Powder Allegedly Caused Cancer in Pro-Figure Skater":

> We have no higher responsibility than the health and safety of consumers who rely on our products. It is important for consumers to know that the safety of cosmetic talc is supported by decades of scientific evidence and independent peer- reviewed studies.

69.     On February 24, 2015, the Company filed a Form 10-K for the fiscal year ended December 28, 2014 (the "2014 10-K") with the SEC, which provided the Company's year-end financial results and position and stated that the Company's disclosure controls and procedures was effective as of December 28, 2014. The 2014 10-K stated that Management's Report on Internal Control Over Financial Reporting "is incorporated herein by reference to the material under the caption 'Management's Report on Internal Control Over Financial Reporting' of the Annual Report, filed as Exhibit 13 to this Report on Form 10-K." Exhibit 13 to the 2014 10-K stated that the Company's internal control over financial reporting was effective as of December 28, 2014. The 2014 10-K was signed by Executive Committee members Gorsky and Caruso. The

2014 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

70.     The 2014 10-K discussed J&J's baby products, stating in pertinent part:

> The Consumer segment includes a broad range of products used in the baby care, oral care, skin care, over-the-counter pharmaceutical, women's health and wound care markets. Baby Care includes the JOHNSON'S® Baby line of products.

71.     The 2014 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

> **Research and Development**
>
> Research activities represent a significant part of the Company's businesses.  Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch.  The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**
>
> **Environment**
>
> The Company is subject to a variety of U.S. and international environmental protection measures.  The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.
>
> *        *        *
>
> The Company engages in areas of human health care where there is an opportunity to make a meaningful difference, and is committed to creating value by developing broadly accessible, high quality, innovative products and services.
>
> (Emphasis added).

72.   The 2014 10-K discussed the regulations that J&J is subject to, including U.S. regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety reporting," stating in pertinent part:

> Most of the Company's businesses are subject to varying degrees of governmental regulation in the countries in which operations are conducted, and the general trend is toward increasingly stringent regulation.  In the U.S., the drug, device, diagnostics and cosmetic industries have long been subject to regulation by various federal and state agencies, primarily as to product safety, efficacy, manufacturing, advertising, labeling and safety reporting.

73.   Exhibit 13 to the 2014 10-K discussed that the risks and uncertainties facing the Company are, among others, "product efficacy or safety concerns resulting in product recalls or regulatory action."

74.   Exhibit 13 to the 2014 10-K discussed the product liability cases against J&J's subsidiaries, while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

> Certain subsidiaries of Johnson & Johnson are involved in numerous product liability claims and lawsuits involving multiple products. Claimants in these cases seek substantial compensatory and, where available, punitive damages.  **While these subsidiaries believe they have substantial defenses**, it is not feasible to predict the ultimate outcome of litigation.  The Company has established product liability accruals in compliance with ASC 450-20 based on currently available information, which in some cases may be limited.  In addition, product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns.  Changes to the accruals may be required in the future as additional information becomes available.

> (Emphasis added).

75.   On April 8, 2015, J&J stated on its website that:

> Various agencies and governmental bodies have examined whether talc is a carcinogen, and none have concluded that it is.  These

include the U.S. Food and Drug Administration and National Toxicology Program, part of the U.S. Department of Health and Human services.

76.     On February 24, 2016, the Company filed a Form 10-K for the fiscal year ended January 3, 2016 (the "2015 10-K") with the SEC, with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of January 3, 2016.  The 2015 10-K was signed by Executive Committee members Gorsky and Caruso.  The 2015 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

77.     The 2015 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

> **Research and Development**
>
> Research activities represent a significant part of the Company's businesses.  Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as **demonstrating product efficacy and regulatory compliance prior to launch.  The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…**
>
> **Environment**
>
> The Company is subject to a variety of U.S. and international environmental protection measures.  The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.
>
> *        *        *

27

The Company engages in areas of human health care where there is
an opportunity to make a meaningful difference, and is committed
to creating value by developing broadly accessible, high quality,
innovative products and services.

(Emphasis added).

78.    The 2015 10-K discussed the regulations that J&J is subject to, including U.S.

regulations concerning "product safety, efficacy, manufacturing, advertising, labeling and safety

reporting," stating in pertinent part:

The Company's businesses are subject to varying degrees of
governmental regulation in the countries in which operations are
conducted, and the general trend is toward increasingly stringent
regulation.  In the U.S., the drug, device and cosmetic industries
have long been subject to regulation by various federal and state
agencies, primarily as to product safety, efficacy, manufacturing,
advertising, labeling and safety reporting.

79.    The 2015 10-K discussed that the risks and uncertainties facing the Company are,

among others, "product efficacy or safety concerns resulting in product recalls or regulatory

action."

80.    The 2015 10-K discussed the product liability cases against J&J's subsidiaries,

while stating that its "subsidiaries believe they have substantial defenses," stating in pertinent part:

Certain subsidiaries of Johnson & Johnson are involved in numerous
product liability claims and lawsuits involving multiple products.
Claimants in these cases seek substantial compensatory and, where
available, punitive damages.  While **these subsidiaries believe they
have substantial defenses**, it is not feasible to predict the ultimate
outcome of litigation.  The Company has established accruals for
product liability claims and lawsuits in compliance with ASC 450-
20 based on currently available information, which in some cases
may be limited.  The Company accrues an estimate of the legal
defense costs needed to defend each matter.  For certain of these
matters, the Company has accrued additional amounts such as
estimated costs associated with settlements, damage and other
losses.  Product liability accruals can represent projected product
liability for thousands of claims around the world, each in different
litigation environments and with different fact patterns.  Changes to

28

the accruals may be required in the future as additional information becomes available.

(Emphasis added).

81.     On December 30, 2016, J&J touted the safety and effectiveness of talc in its products on its website at https://www.safetyandcarecommitment.com/Ingredients/Talc, stating in pertinent part:

**In our products**

We continue to use talc in our products because decades of science have reaffirmed its safety.  Because of its safety and effectiveness, we confidently include pharmaceutical grade talc in our products. Your trust  in  our  products and your confidence using them every day is a huge responsibility—that's why we only use ingredients in our products deemed safe by the latest science.

Science, research, clinical evidence and 30 years of studies by medical experts around the world continue to support the safety of cosmetic talc.

82.     On February 27, 2017, the Company filed a Form 10-K for the fiscal year ended January 1, 2017 (the "2016 10-K") with the SEC, with the SEC, which provided the Company's year-end financial results and position and stated that the Company's internal control over financial reporting and disclosure controls and procedures were effective as of January 1, 2017.  The 2016 10-K was signed by Executive Committee members Gorsky and Caruso.  The 2016 10-K also contained signed SOX certifications by Gorsky and Caruso attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

83.     The 2016 10-K discussed J&J's baby products, stating in pertinent part:

The Consumer segment includes a broad range of products used in the baby care, oral care, beauty (previously referred to as skin care), over-the-counter pharmaceutical, women's health and wound care markets.  Baby Care includes the JOHNSON'S® line of products.

84.     The 2016 10-K discussed the pending lawsuits against J&J and its subsidiaries based on nondisclosure of alleged health risks associated with talc contained in J&J's baby products, stating in pertinent part:

> Claims for personal injury have been made against Johnson & Johnson Consumer Inc. and Johnson & Johnson arising out of the use of JOHNSON'S® Baby Powder.  The number of pending product liability lawsuits continues to increase, and the Company continues to receive information with respect to potential costs and the anticipated number of cases.  Lawsuits have been primarily filed in state courts in Missouri, New Jersey and California.  In addition, a federal multi-district litigation proceeding has been created for this litigation in the District Court of New Jersey.  The Company has established an accrual for defense costs in connection with product liability litigation associated with JOHNSON'S® Baby Powder. Changes to this accrual may be required in the future as additional information becomes available.

> *     *     *

> In June 2014, the Mississippi Attorney General filed a complaint in Chancery Court of The First Judicial District of Hinds County, Mississippi against Johnson & Johnson and Johnson & Johnson Consumer Companies, Inc. (now Johnson & Johnson Consumer Inc.) (JJCI).  The complaint alleges that defendants failed to disclose alleged health risks associated with female consumers' use of talc contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product no longer sold by JJCI) and seeks injunctive and monetary relief.  This matter is currently scheduled for trial in September 2017.

> *     *     *

> In May 2014, two purported class actions were filed in federal court, one in the United States District Court for the Central District of California and one in the United States District Court for the Southern District of Illinois, against Johnson & Johnson (J&J) and Johnson & Johnson Consumer Companies, Inc. (now Johnson & Johnson Consumer Inc.) (JJCI), alleging violations of state consumer fraud statutes based on nondisclosure of alleged health risks associated with talc contained in JOHNSON'S® Baby Powder and JOHNSON'S® Shower to Shower (a product no longer sold by JJCI).  Both cases seek injunctive relief and monetary damages;

neither includes a claim for personal injuries.  In October 2016, both cases were transferred to the United States District Court for the District Court of New Jersey as part of a newly created federal multi-district litigation.  In December 2016, J&J and JJCI filed a motion to dismiss one of the cases.

85.    The 2016 10-K discussed J&J's commitment to "delivering high quality and innovative products," and its research activities of "demonstrating product efficacy and regulatory compliance prior to launch," stating in pertinent part:

**Research and Development**

Research activities represent a significant part of the Company's businesses.  Research and development expenditures relate to the processes of discovering, testing and developing new products, improving existing products, as well as demonstrating product efficacy and regulatory compliance prior to launch.  The Company remains committed to investing in research and development with the aim of delivering high quality and innovative products…

**Environment**

The Company is subject to a variety of U.S. and international environmental protection measures. The Company believes that its operations comply in all material respects with applicable environmental laws and regulations.

                              *         *         *

The Company is broadly based in human health care, and is **committed to creating value by developing accessible, high quality, innovative products and services.**

(Emphasis added).

86.    The 2016 10-K discussed that the risks and uncertainties facing the Company are, among others, "[p]roduct efficacy or safety concerns, whether or not based on scientific evidence, potentially resulting in product withdrawals, recalls, regulatory action on the part of the U.S. Food and Drug Administration (or international counterparts), declining sales and reputational damage."

87.    The 2016 10-K discussed the product liability cases against J&J and its subsidiaries, while stating that "the Company believes it has substantial defenses," stating in pertinent part:

> Johnson & Johnson and certain of its subsidiaries are involved in numerous product liability claims and lawsuits involving multiple products.  Claimants in these cases seek substantial compensatory and, where available, punitive damages.   While **the Company believes it has substantial defenses**, it is not feasible to predict the ultimate outcome of litigation.   The Company has established accruals for product liability claims and lawsuits in compliance with ASC 450-20 based on currently available information, which in some cases may be limited.  The Company accrues an estimate of the legal defense costs needed to defend each matter when those costs are probable and can be reasonably estimated.  For certain of these matters, the Company has accrued additional amounts such as estimated costs associated with settlements, damages and other losses.  To the extent adverse verdicts have been rendered against the Company, the Company does not record an accrual until a loss is determined to be probable and can be reasonably estimated.  Product liability accruals can represent projected product liability for thousands of claims around the world, each in different litigation environments and with different fact patterns.  Changes to the accruals may be required in the future as additional information becomes available.
>
> The most significant of these cases include the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System, the PINNACLE® Acetabular Cup System, pelvic meshes, RISPERDAL®, XARELTO® and JOHNSON'S® Baby Powder. As of January 1, 2017, in the U.S. there were approximately 2,000 plaintiffs with direct claims in pending lawsuits regarding injuries allegedly due to the DePuy ASR™ XL Acetabular System and DePuy ASR™ Hip Resurfacing System, 9,400 with respect to the PINNACLE® Acetabular Cup System, 54,800 with respect to pelvic meshes, 18,500 with respect to RISPERDAL®, 16,900 with respect to XARELTO® and 3,100 with respect to JOHNSON'S® Baby Powder.
>
> (Emphasis added).

88.    On July 1, 2017, J&J touted the safety and effectiveness of talc in its products on its website at https://www.johnsonsbaby.com.ph/baby-products/johnsons-baby-powder, stating in pertinent part:

32

**Is talc safe for my baby's skin?**

JOHNSON'S® Baby talc products are made using U.S. Pharmacopeial (USP) grade talc to ensure it meets the highest-quality, purity and compliance standards. **Our talc is carefully selected, processed and tested to ensure that is asbestos free, as confirmed by regular testing conducted since the 1970s.**

Our confidence in using talc is based on a long history of safe use and more than 30 years of research by independent researchers, scientific review boards and global regulatory authorities. Read more about our Safety & Care Commitment here: http://www.safetyandcarecommitment.com/ingredient-info/other/talc

(Emphasis added).

89.     On September 21, 2017, Ernie Knewitz, a spokesman for J&J, said in an emailed statement to *Bloomberg* that:

'We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation,' Knewitz said. 'Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products.'

90.     On November 16, 2017, *Reuters* published an article titled, "Johnson & Johnson wins California lawsuit claiming asbestos in talc caused cancer," wherein J&J was quoted stating that "Johnson's Baby Powder has been around since 1894 and it does not contain asbestos or cause mesothelioma or ovarian cancer."

**C.     The Truth Is Revealed**

91.     On June 2, 2016, *Reuters* published an article titled, "Talc linked to ovarian cancer risk in African-American women," stating that J&J targeted its powder products to minorities, stating in pertinent part:

In the 1990s, Johnson and Johnson outlined a plan to hike flagging sales of its powder "by targeting" black and Hispanic women, according to a company memorandum made public in recent lawsuits leading to multimillion-dollar verdicts against the powder manufacturer.

92.     On September 21, 2017, *Bloomberg* published an article titled, "Johnson & Johnson alerted to risk of asbestos in talc in '70s, files show," stating that "documents indicate that J&J has known for decades that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer," stating in pertinent part:

**J&J Was Alerted to Risk of Asbestos in Talc in '70s, Files Show**

By Jef Feeley, Margaret Cronin Fisk, and Jared S. Hopkins

September 21, 2017, 10:49 PM EDT Updated on September 22, 2017, 11:50 AM EDT

**Documents unsealed in suit show traces of carcinogen in mine**

**J&J's tests going back to 1972 find no traces of asbestos**

Johnson & Johnson trained its employees to reassure anyone concerned about whether the company's talcum powder contained asbestos that the cancer-causing substance "has never been found and it never will'' in its iconic baby powder, according to an undated memo unsealed in a lawsuit against the drugmaker.

**But plaintiffs say other unsealed documents indicate that J&J has known for decades that its talc products include asbestos fibers and that the exposure to those fibers can cause ovarian cancer. The talc used by J&J to make its products "is not now, nor has it ever been, free from asbestos and asbestiform fibers,'' according to the lawsuit filed on behalf of more than 50 women in St. Louis.**

The unsealed documents add another dimension to the claims against J&J as it defends itself from more than 5,000 suits across the U.S. blaming its baby powder products for causing women to develop ovarian cancer. While five juries have ruled against J&J, the company has won one case and had some other claims thrown out.

One of the documents unsealed Sept. 6 indicates that in May 1974, an official at J&J's Windsor mine in Vermont recommended "the use of citric acid in the depression of chrysotile asbestos'' from talc extracted from the site.

"The use of these systems is strongly urged by this writer to provide protection against what are currently considered to be materials presenting a severe health hazard and are potentially present in all talc ores in use at this time," the mine's director of research and development wrote then.

*     *     *

The unsealed files were used as part of an April pre-trial deposition given by Joanne Waldstreicher, J&J's chief medical officer since 2013. Under questioning by plaintiffs' lawyer Mark Lanier, Waldstreicher maintained that J&J's baby powder products are asbestos free. We have experts that assure there's no asbestos in our talc," she told the lawyer.

**Consumer Safety**
According to the undated training memo, J&J representatives continued to reiterate at medical conferences that there wasn't any asbestos in the company's talc-based products.

"Though there will never be a problem with Johnson & Johnson talc, we also endeavor vigorously to keep an eye on all the sources of talc worldwide, which might be used by other powder manufacturers and sold here," officials said.

In 1973, a company report about J&J's Windsor Materials talc mine in Vermont noted that officials were working with federal officials to check for fibers that could indicate the presence of asbestos at the site. A J&J official said in that report that the company's baby powder "contains talc fragments classifiable as fiber. Occasionally sub-trace quantities of" two types of asbestos "are identifiable and these might be classified as asbestos fiber.''

Concerned that asbestos may have tainted talc used in the company's products, a J&J official suggested the company move toward using corn starch in its consumer products rather than talc, according to the report.

According to the unsealed documents, J&J also pushed to stop the distribution of a booklet revealing the discovery of trace amounts of asbestos in the talc the company bought from an Italian mine.

Owners of the Val Chisone mine near Turin produced the booklet in 1974 to market the site's talc.

"The business threat" with the Italian publication, according to a J&J research scientist, "is that it can raise doubts on the validity of the documentation of purity and safety of talc.''

The scientist persuaded the mine's owners to stop distributing English-language versions of the booklet until J&J officials could rewrite it, according to the unsealed documents.

**Trace Amounts**

J&J contends that testing at the Val Chisone mine two years before the marketing pamphlet was written showed no evidence of asbestos at the site. Dr. F.D. Pooley of University College, Cardiff, Wales, said in a 1972 report that "no chrysotile was found at the mine or in the samples taken."

"Some tremolite was located, but was not asbestiform in character and has not been detected in talc imported into Great Britain for the past year," Pooley said, according to documents provided by J&J, "nor in shipments dating back to 1949."

Even trace amounts of asbestos in talc products pose a cancer risk, said Dr. Barry Castleman, a consultant hired by government agencies and health groups to gauge the health effects of the once-commonly used insulation material. He has testified for plaintiffs in asbestos cases, not in talc cases.

"It is a problem even if it's found in small amounts in talc, especially because it's used by children and women," Castleman said in an interview. He added that he wrote J&J in 1972 pointing out that asbestos in talc consumer products could cause serious health problems. "They responded that there was no asbestos in their talc," Castleman said.

Lanier, the plaintiffs' lawyer, asked Waldstreicher during her deposition if she'd seen the rewritten version of the mine booklet in which all references to asbestos were stricken. "I don't see that here," she said.

Lanier also pointed to some studies of J&J's talc products that he said found asbestos, and questioned whether the company should have warned consumers about those findings. He asked her specifically about the Windsor mine testing, and she said "40 years

ago, there could have been different types of testing that may not be as accurate as the testing we have today."

"Would you agree that if asbestos is in the product, you all ought to be warning people?" Lanier asked.    At first, Waldstreicher responded that it was a "hypothetical question." Eventually, she conceded.

"I would like to be warned before I were around any cancer-causing substance," she said.

93.    On this news, shares of J&J fell $2.28 per share over five consecutive trading days to close at $129.47 per share on September 28, 2017, damaging investors.

94.    On February 5, 2018, *CNBC* published an article titled, "Johnson & Johnson falls on report that lawsuits could expose potentially damaging documents," stating in pertinent part:

### Johnson & Johnson falls on report that lawsuits could expose potentially damaging documents

- Johnson & Johnson's stock fell on a report that court proceedings could expose potentially damaging documents.

- J&J is facing numerous lawsuits claiming its talc products such as Johnson's Baby Powder caused cancer.

- Johnson & Johnson has said baby powder does not contain asbestos and does not cause ovarian cancer or mesothelioma.

Angelica LaVito | @angelicalavito

Published 1:01 PM ET Mon, 5 Feb 2018 Updated 4:46 PM ET Mon, 5 Feb 2018

Shares of Johnson & Johnson fell Monday on a report that court proceedings could expose potentially damaging documents.

J&J is facing numerous lawsuits claiming its talc products such as Johnson's Baby Powder caused cancer.  The company has insisted its baby powder does not contain asbestos and causes neither mesothelioma nor ovarian cancer.

> In a statement, a J&J spokesman pointed to a California judge ruling in favor of J&J in November in a lawsuit by a woman who said she developed mesothelioma after using the company's talc-based products. He said the company would continue to defend its position in future cases.
>
> "We are confident that our talc products are, and always have been, free of asbestos, based on decades of monitoring, testing and regulation dating back to the 1970s," he said. "Historical testing of samples by the FDA, numerous independent laboratories, and numerous independent scientists have all confirmed the absence of asbestos in our talc products."

95.     On this news, shares of J&J fell $7.29 per share or over 5% from its previous closing price to close at $130.39 per share on February 5, 2018, damaging investors.

96.     A February 7, 2018 press release issued by the law firm Beasley Allen stated that internal J&J documents from 1972 "note that asbestos was found in 100 percent of talc samples tested at the time."

97.     Finally, on December 14, 2018, *Reuters* published its investigative findings "Johnson & Johnson knew for decades that asbestos lurked in its Baby Powder" stating, in pertinent part:

> Facing thousands of lawsuits alleging that its talc caused cancer, J&J insists on the safety and purity of its iconic product. But internal documents examined by Reuters show that the company's powder was sometimes tainted with carcinogenic asbestos and that J&J kept that information from regulators and the public.

Also on December 14, 2018, *The New York Times* published similar findings in "Johnson & Johnson Feared Baby Powder's Possible Asbestos Link for Years" stating "Johnson & Johnson says its product is safe. But asbestos, a carcinogen that can exist underground near talc, was a concern inside the company for decades."

98.     J&J's share price fell dramatically on massive trading volume, dropping nearly 17%, or $25.00 per share, closing at a low on December 24, 2018 of $122.84.

## VI.     THE PLAN'S FIDUCIARY BREACHES:
## FIDUCIARY ACTION SHOULD HAVE BEEN TAKEN

99.     Throughout the Class Period, Defendants knew or should have known about J&J's failure to disclose the truth about its talc products.  Defendants knew or should have known that J&J's public SEC filings were materially false and misleading, and that J&J's stock price did not reflect material information about the Company.  They further knew that J&J, along with Executive Committee members Gorsky and Caruso, misled the public in its SEC filings on which the public was relying.  Yet Defendants did nothing to act upon that knowledge to protect the retirement savings of the Plan participants to whom they owed their fiduciary duties.

100.     Defendant Fasolo was a member of the Executive Committee, a committee composed of J&J's most senior managers who oversee and coordinate the activities of the Company's three business segments, including the Consumer segment.  Members of the Executive Committee include its CEO Gorsky; CFO Caruso; Duato, who is responsible for the Company's Consumer and Pharmaceutical sectors; Worldwide Chairman of the Consumer Sector Mesquita; Chief Scientific Officer Stoffels; Chief Communications Officer Sneed; General Counsel Ullmann; and new CFO Wolk.

101.     CEO Gorsky and CFO Caruso were the Sarbanes-Oxley co-signatories of J&J's SEC filings, and, indeed, were the people who actually made many of J&J's misleading statements that artificially drove up the Company's stock price.  They were centrally involved in the preparation of the financial statements, including with respect to what was and was not disclosed regarding the safety of the Company's talc products.  They were responsible for ensuring that that reporting complied with the federal securities laws, which of course require truth and accuracy in all financial reporting.  Just like the CEOs before him, as seen throughout the internal J&J

documents that were recently made public, Gorsky was aware of J&J's longtime position that its talc products were "safe" and all of the past and present scientific evidence to the contrary.

102.    Duato and Mesquita were heads of J&J's Consumer segment, the business unit responsible for the manufacturing and sale of Johnson's Baby Powder, and oversaw all aspects of that segment.  This included, along with Stoffels, oversight of the testing of talc products for asbestos.

103.    Sneed, as Chief Communications Officer, was responsible for the preparation and oversight of all statements made to consumers regarding the safety of J&J's talc products.

104.    Ullmann, as J&J's General Counsel, oversaw all of the Company's legal matters, including the thousands of lawsuits filed against J&J for its failure to warn consumers of the dangers associated with the use of its talc products.  Ullmann also oversaw and reviewed the collection of the damning internal documents recently produced in pending litigations; he had direct knowledge of this evidence, which showed that J&J had been aware of the presence of asbestos in its talc products since the 1950s.

105.    Through his membership on the Executive Committee, Fasolo was directly involved in frequent discussions about the presence of asbestos in the Company's talc products. Arguably, no one else at J&J was more centrally involved in the Company's misrepresentations than the members of the Executive Committee.  No one else was better positioned to understand the effect that these misrepresentations were having on J&J's stock price than the members of the Executive Committee, including Fasolo.

106.    Given the longstanding concealment by J&J of the asbestos in its talc, and the circulation of this information throughout the Company, it is far more likely than not that each Defendant knew or should have known that the misrepresentations regarding the presence of

asbestos in the Company's talc products.  The truth was concealed from the public, enabled J&J's stock price to trade at an artificially high value, and, sure enough, when the truth finally did emerge, J&J's stock price dropped as that artificial inflation value was wiped away.

107.    Fasolo, as well as the other members of the Committee, had a front row seat as J&J continuously misrepresented the safety of its talc products.  And each Defendant was also a fiduciary of the Plan, charged under ERISA with ensuring the prudence of Plan investments, well aware that the Fund was a popular Plan investment, and also aware that that popular investment had become an imprudent one.  Yet none of them took a single action to protect Plan participants from that imprudent and ultimately harmful investment.

108.    As Plan fiduciaries, Defendants were required to investigate and monitor whether the Fund was a prudent retirement investment and to cause corrective disclosures to be made about J&J.  Notwithstanding these duties, Defendants did nothing to protect the retirement savings of the Plan participants from harm as the result of the artificial inflation of J&J's stock price.

### A.    Corrective Disclosures Should Have Been Made and Would Not Have Caused "More Harm Than Good"

109.    Defendants had the ability to try to effectuate corrective public disclosures to cure the fraud consistent with the requirements of the federal securities laws to correct the artificial inflation.  Fasolo, as a member of the Executive Committee, was uniquely situated to fix this problem.  He could have tried to accomplish truthful or corrective disclosures to be made much earlier to cure the Company's fraud and to make the Fund a prudent investment again for the Plan.

110.    If Defendants had tried to cause corrective public disclosure near the very beginning of J&J's fraud—at the beginning of the Class Period—almost all of the artificial inflation of J&J's stock price that occurred could have been avoided, and virtually no Plan participants who purchased inflated shares of the Fund would have been harmed.  But as the fraud

went on and on, more and more Plan participants made purchases at artificially high prices, the harm to Plan participants steadily increased.  As two experts framed the issue:

> If the fraud occurs on one day at the beginning of the class period so that the gap between the value line and the price line appears immediately, the bias will be small because only investors who purchased the securities in the first few days of the class period are affected by the error.  However, if the fraud consists of a series of omissions and misrepresentations so that the gap between the price line and the value line widens slowly, *the inflation will be overstated for a much larger group of purchasers.*

Bradford Cornell and R. Gregory Morgan, *Using Finance Theory to Measure Damages in Fraud on the Market Cases*, 37 UCLA L. Rev. 883, 911 (1990) (emphasis added).

111.    Defendants also needed to act to prevent future harm and damage to the Plan's investment in J&J stock.  This position was at risk from a large stock price correction when the public learned the truth and realized that the Company had concealed a fraud.  As time passed, J&J stock price inflated further due to the fraud and the size of the scandal grew, making the eventual collapse worse.  The concealment of the fraud put the Plan's holding of J&J stock at risk for a serious and lasting decline in value, and hurt management's credibility and the long-term prospects of J&J as an investment.   This significant harm to the Plan could have been prevented or mitigated by timely disclosure.

112.    This reputational damage is not merely theoretical.  Economists and finance experts have conducted numerous empirical studies on the matter, and concluded "the reputational penalty" a company suffers because it perpetrates a prolonged fraud is significantly greater than any regulatory fines or other penalties that it may occur—in fact, the reputational penalty is "7.5 times the sum of all penalties imposed through the legal and regulatory system."  Jonathan M. Karpoff, D. Scott Lee and Gerald S. Martin, *The Cost to Firms of Cooking the Books*, Journal of Financial and Quantitative Analysis, Vol. 43, No. 3 (Sept. 2008).  Moreover, "*[f]or each dollar*

*that a firm misleadingly inflates its market value, on average, it loses this dollar when its misconduct is revealed, plus an additional $3.08 … [of which] $2.71 is due to lost reputation.*" *See id.* (emphasis added).  And this reputational damage, unsurprisingly, increases the longer the fraud goes one.  *Id.*

113.    Defendants cannot argue that the federal securities laws prevented them from causing a truthful disclosure to be made.  In this situation, ERISA and the federal securities laws compelled Defendants to take exactly the same action—tell the truth and correct the inflated stock price.  No law or duty required them to conceal or prevent the disclosure of the truth—quite the opposite.

114.    This also means that Defendants knew—or should have known—that disclosure of the fraud was going to happen one way or another.  J&J had spent over 60 years concealing the fact that asbestos was present in its talc products.  The Company sought to influence and manipulate government agencies by withholding all evidence which did not support its misrepresentations that its products were safe.  It was more likely than not that the Company's fraud would soon be discovered, as evidenced by the increasing number of users of its products developing cancer, the increasing number of lawsuits filed by victims, and the increasing number of those cases overcoming motions to dismiss and proceeding on to discovery, which Defendants knew (or should have known).  When the internal documents showing the perpetration of the massive fraud were made public, the truth would certainly have to be disclosed to the public.  In other words, J&J's misrepresentations about the safety of its talc products were a ticking time bomb.  Eventually, that bomb would go off and the truth would have to be disclosed, bringing the artificial inflation of J&J's stock to a painful end.  If Defendants were really considering what action would do Plan participants more harm or good, they should have considered that, given the

likelihood of the truth coming out, a stock price correction was unavoidable—the only relevant question for them should have been whether it would be better for Plan participants for the correction to occur sooner or later.  Given the overwhelming evidence and research showing that later disclosure of fraud increases the risk of a harsher price correction, as well as a slower-than-necessary price recovery, and given the virtual certainty that J&J's fraud was going to be revealed one way or another, Defendants should have recognized that earlier disclosure was by far the less harmful option than the one that they did choose—namely, waiting for the truth to come out on its own.  This decision by Defendants led to a much harsher price correction, and a more sluggish recovery, than was necessary.

115.    Defendants could not have reasonably believed that attempting to effectuate truthful, corrective disclosure would do more harm than good to the Plan or its participants.   First and foremost, the participation of the fiduciaries in a fraud that deceives the Plan participants runs counter to ERISA's fundamental obligation that fiduciaries must communicate truthfully and accurately with those to whom a fiduciary duty is owed.  At a minimum, Defendants had the fiduciary obligation to cause the truth to be disclosed to correct the fraud and not perpetuate it.

116.    Truthful disclosure was also needed to prevent worse future harm to the Plan and J&J's stock price.  Defendants may argue that they were concerned that correcting the fraud would temporarily lower the stock price, but that concern should not have deterred disclosing the truth.  Every stock fraud in history, when corrected, has resulted in a temporary drop in the stock price; that is an inherent quality of efficient markets.  But here, with disclosure a virtual certainty regardless and an increasing risk of a harsher correction and a slower recovery, Defendants should have disclosed the truth sooner rather than later to minimize the ongoing harm (to prevent further

artificial inflation and purchases at excessive prices) as well as worse future damage to J&J's stock price, and, therefore, the retirement savings of Plan participants invested in the Fund.

117.    The longer that J&J's fraud went on, the more Plan purchasers bought at artificially inflated prices, and the size of the harm to each purchaser increased over time as the stock price inflated.  As a result, J&J stock had farther to fall when the truth inevitably came out, so that the purchasers were hurt even worse as the result of choosing to invest in the Fund.

118.    The Plan holders of Fund shares suffered greater harm and damage in this same manner from Defendants' failure to end the fraud.  While they held Fund shares over the period of time when the stock price was artificially appreciating in value, they were deceived by the false growth.  They suffered greater losses when J&J's stock price corrected, and fell further due to the loss of management credibility.  They also were deprived of the option of transferring their shares into one of the different, prudent investment alternatives under the Plan, which would have spared them from the greater losses when the stock correction took place.

119.    Additionally, the issuance of a corrective disclosure was arguably required by the federal securities laws, reifying the inevitability of the truth's coming out.  By the very same mechanism that J&J could have used to make corrective disclosures to the general public under the federal securities laws, it could also have made disclosures to Plan participants, because Plan participants are, after all, part of the general public.  Defendants did not have to make a "special" disclosure only to Plan participants, but could simply have caused, through personnel with disclosure responsibilities, one corrective disclosure to be made to the world and thereby simultaneously satisfied its obligations under the federal securities laws *and* ERISA.

120.    And, even if Defendants determined that disclosure was not required by the securities laws, disclosure was certainly not prohibited by them.  As discussed above, the truth's

emergence, and thus J&J's stock price correction, was inevitable.  Thus, Defendants, in weighing harm versus good, should have concluded that even a disclosure not required by the securities laws would, in this case, be less harmful than waiting for the disclosure to happen through some other mechanism—in this case, the public disclosure of J&J's internal documents produced in recent litigation.

121.    Indeed, earlier disclosure by J&J would have affirmatively benefitted the Plan and its participants, as well as mitigated the harm.  With the truth about J&J's fraud and inflated revenues and earnings, Plan participants could properly evaluate the Fund versus their other investment alternatives for their retirement savings.  Plan participants considering new purchases with their contributions could select healthier, prudent investment options available through the Plan which outperformed J&J stock during the Class Period.  And over the long term, the failure to act by the Plan fiduciaries to expose corporate fraud is likely to have a chilling effect on future purchases of the Fund by Plan participants, because their trust in their employer has likely been eroded by this malfeasance.  Such an effect constitutes a net harm to the Plan.

122.    Millions upon millions of dollars were lost from the retirement accounts of J&J employees.  Defendants, as Plan fiduciaries, are directly responsible for this enormous harm that its breaches of duty caused.

## VII.    CLASS ACTION ALLEGATIONS

123.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Procedure 23(a), (b)(l) and/or (b)(2) on behalf of themselves and the following class of persons similarly situated (the "Class"):

> All individuals, excluding Defendants, who participated in the Plan and whose individual accounts purchased and/or held the Fund at any time between February 22, 2013, through January 25, 2019, inclusive.

124.    Excluded from the Class are Defendants, the officers and directors of the Company, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

125.    The members of the Class are so numerous that joinder of all members is impracticable.  While the exact number of Class members is unknown to plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe that there are over 60,000 members in the proposed Class.  Record owners and other members of the Class may be identified from records maintained by J&J or the Plan and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

126.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law complained of herein.

127.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

a.      Whether Defendants each owed a fiduciary duty to the Plan, to Plaintiffs and to members of the Class;

b.      Whether Defendants breached fiduciary duties owed to the Plan, to Plaintiffs and to members of the Class by failing to act prudently and solely in the interests of the Plan and the Plan's participants and beneficiaries;

c.      Whether Defendants failed to provide sufficient material disclosure to any and all Plan fiduciaries;

d.      Whether Defendants violated ERISA; and

e.      The extent to which Class members have sustained damages and the proper measure of those damages.

128.     Plaintiffs' claims are typical of the claims of the members of the Class because Plaintiffs and the other members of the Class each sustained damages or were negatively affected by Defendants' wrongful conduct in violation of ERISA as complained of herein.

129.     Plaintiffs will fairly and adequately protect the interests of the members of the Class and have retained counsel highly competent and experienced in class action and complex litigation, including actions involving ERISA plans.  Plaintiffs have no interest antagonistic to or in conflict with those of the Class.

130.     Class action status in this ERISA action is warranted under Rule 23(b)(1)(B) because this action is also brought on behalf of the Plan, and any prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to the Plan which would, as a practical matter, be dispositive of the interests of the other members not parties to the actions, or substantially impair or impede their ability to protect their interests.

131.     Class action status is also warranted under the other subsections of Rule 23(b) because: (i) prosecution of separate actions by the members of the Class would create a risk of establishing incompatible standards of conduct for Defendants; (ii) Defendants have acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory or other appropriate equitable relief with respect to the Class as a whole.

132.     Plaintiffs also bring this action on behalf of the Plan pursuant to ERISA §§ 409(a), 502(a)(2), 29 U.S.C. §§ 1109(a), 1132(a)(2).

<u>**COUNT I**</u>
**Failure to Prudently and Loyally Manage the Plan's Assets**
**(Against All Defendants)**

133.     Plaintiffs incorporate the allegations contained in the previous paragraphs of this Complaint as if fully set forth herein.

134.    At all relevant times, as alleged above, all Defendants were fiduciaries within the meaning of ERISA § 3(21)(a), 29 U.S.C. § 1002(21)(A) in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

135.    Under ERISA, fiduciaries who exercise discretionary authority or control over management of a plan or disposition of a plan's assets are responsible for ensuring that investment options made available to participants under a plan are prudent.  Furthermore, such fiduciaries are responsible for ensuring that all investments in the Company's stock in the Plan were prudent and that such investment was consistent with the purpose of the Plan.  Defendants are liable for losses incurred as a result of such investments being imprudent.

136.    A fiduciary's duties of loyalty and prudence require it to disregard plan documents or directives that it knows or reasonably should have known would lead to an imprudent result or would otherwise harm plan participants or beneficiaries.  ERISA § 404(a)(l)(D), 29 U.S.C. § 1104(a)(l)(D).  Thus, a fiduciary may not blindly follow plan documents or directives that would lead to an imprudent result or that would harm plan participants or beneficiaries, nor may it allow others, including those whom they direct or who are directed by the plans, including plan trustees, to do so.

137.    Defendants' duties of loyalty and prudence also obligate them to speak truthfully to participants, not to mislead them regarding the Plan or its assets, and to disclose information that Plan participants need in order to exercise their rights and interests under the Plan.  This duty to inform participants includes an obligation to provide participants and beneficiaries of the Plan with complete and accurate information, and to refrain from providing inaccurate or misleading information, or concealing material information, regarding the Plan's investments and investment

options such that the Plan participants can make informed decisions with regard to the prudence of investing in such options made under the Plan.

138.    Defendants breached their duties to prudently and loyally manage the Plan's assets. During the Class Period, Defendants knew that the Fund had become an imprudent investment for Plan participants' retirement savings because there was false and misleading material information given to Plan participants and the public about the stock that artificially inflated its value.

139.    Accordingly, Defendants should have taken appropriate responsive action by trying to effectuate, through personnel with disclosure responsibilities, corrective public disclosures to cure the fraud, correct the stock price, and render the Fund a prudent investment again.  As such, between February 22, 2013, through January 25, 2019, Plan participants could not appreciate the true risks presented by investments in J&J's stock and, therefore, could not make informed decisions regarding their investments.

140.    As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan, and indirectly Plaintiffs and other Plan participants, suffered foreseeable damage to or lost a significant portion of their retirement investments.  Pursuant to ERISA § 502(a), 29 U.S.C. § 1132(a) and ERISA § 409, 29 U.S.C. § 1109(a), Defendants are liable to restore the losses to the Plan caused by their breaches of fiduciary duties.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray for:

A.    Determination that the instant action may be maintained as a class action under Rule 23, Federal Rules of Civil Procedure, appointing Plaintiffs as class representatives, and determining that Plaintiffs' counsel satisfies the prerequisites of Rule 23(g);

B.     Declaration that Defendants breached ERISA fiduciary duties owed to the Plan and its participants;

C.     An Order compelling Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of their fiduciary duties, including losses to the Plan resulting from imprudent investment of the Plan's assets, to restore to the Plan all profits Defendants made through use of the Plan's assets, and to restore to the Plan all profits that the participants would have made if Defendants had fulfilled their fiduciary obligations;

D.     Imposition of a Constructive Trust on any amounts by which Defendants were unjustly enriched at the expense of the Plan as the result of breaches of fiduciary duty;

E.     An Order enjoining Defendants from any further violations of their ERISA fiduciary obligations;

F.     Actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses including the lost opportunity costs;

G.     An Order that Defendants allocate the Plan's recovery to the accounts of all participants who had any portion of their account balances invested in the Fund in proportion to the accounts' losses attributable to the decline in the price of its stock or the value of investment in alternative options under the Plan.

H.     Awarding the Plan or Plan participants rescission or money damages including pre-judgment interest;

I.     An Order awarding costs pursuant to 29 U.S.C. § 1132(g);

J.     An Order awarding attorneys' fees pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine;

K.      An Order for equitable restitution and other appropriate equitable monetary relief against Defendants; and

L.      Such other and further relief the Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiffs and the Class request a jury trial for any and all Counts for which a trial by jury is permitted by law.

Dated: January 25, 2019                   By: */s/ Justin Sauerwald*
                                              Justin Sauerwald

                                          **ZAMANSKY LLC**
                                          Samuel E. Bonderoff*
                                          Jacob H. Zamansky*
                                          Edward H. Glenn, Jr.*
                                          Justin Sauerwald
                                          50 Broadway, 32nd Floor
                                          New York, NY 10004
                                          Telephone:      (212) 742-1414
                                          Facsimile:      (212) 742-1177
                                          Email:          *justin@zamansky.com*

                                          **Pro Hac Vice* application forthcoming

                                          *COUNSEL FOR PLAINTIFFS AND
                                          THE PUTATIVE CLASS*

## LOCAL CIVIL RULE 11.2 CERTIFICATION

Pursuant to Local Civil Rule 11.2, I hereby certify that the matter in controversy is related to the following civil action:  *Frank Hall v. Johnson & Johnson, et al.*, Case No. 3:18-cv-01833-FLW-TJB.

I hereby certify that the following statements made by me are true.  I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

Dated: January 25, 2019                          By: */s/ Justin Sauerwald*
                                                           Justin Sauerwald

**ZAMANSKY LLC**
Samuel E. Bonderoff*
Jacob H. Zamansky*
Edward H. Glenn, Jr.*
Justin Sauerwald
50 Broadway, 32nd Floor
New York, NY 10004
Telephone:     (212) 742-1414
Facsimile:     (212) 742-1177
Email:          *justin@zamansky.com*

*Pro Hac Vice* application forthcoming

*COUNSEL FOR PLAINTIFFS AND
THE PUTATIVE CLASS*